IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

JEFFREY BILYEU, JESSICA BILYEU,      )
STEPHANIE BRUFFEEY, MARK             )
COFER, GREGORY SHEETS, and           )
WILLIAM WEBB,                        )
on their own behalf and on behalf of )
all others similarly situated,       )
                                     )      Case No. 3:21-cv-352
                 Plaintiffs,         )      Jury Demanded
                                     )
        v.                           )
                                     )
UT-BATTELLE, LLC,                    )
                                     )
                 Defendant.          )

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

### INTRODUCTION

Plaintiffs seek an extraordinary remedy of injunction before the EEOC has even commenced its investigation into their claims. While this case has roots in a virus that is novel, the legal issues presented are not. Every day, the federal courts address questions about reasonable accommodations under the ADA and religious accommodations under Title VII. At its core, this is just one of those garden-variety cases, and it is one that is premised on wildly exaggerated, and manifestly incorrect, factual claims. The actual facts show that:

- UT-Battelle, LLC ("UT-Battelle") has implemented a thoughtful and reasonable process for considering accommodation requests that has been animated by government directives, its experience with COVID-positive employees during the ongoing pandemic, and the need to ensure the effective execution of important national missions of the Department of Energy ("DOE");

1

- UT-Battelle has *granted* the overwhelming number of medical accommodation requests that it has received;

- Plaintiff Gregory Sheets, the only named Plaintiff who has received a denial of his medical accommodation request, had his request denied because he *refused* to engage in the very interactive process he now claims is non-existent; and,

- Plaintiffs' proposed religious accommodations would cause more than a trivial burden on UT-Battelle and its employees.

Granting an expedited injunction request in the teeth of these facts would be a dangerous intrusion into the employee-employer relationship, and upon the jurisdiction of the EEOC, that would open the floodgates of TRO motions in every discrimination case brought by a current employee. UT-Battelle respectfully requests that the Court deny Plaintiffs' request for a TRO.

## STATEMENT OF FACTS

### I. BACKGROUND ON UT-BATTELLE

UT-Battelle currently has a Prime Contract with the Department of Energy ("DOE") to manage and operate Oak Ridge National Laboratory (ORNL) for the U.S. Department of Energy. (Zahn Aff. ¶ 2, attached as Ex. A). To accomplish its missions in scientific discovery, national security, and clean energy, ORNL brings top scientific talent from around the world to some of the nation's largest and most complex research facilities. (*Id.* ¶ 6). ORNL is one of the few places where "big science" occurs across diverse disciplines and from fundamental discovery to marketable applications. To achieve breakthroughs that address some of the world's most significant scientific and technical challenges, UT-Battelle staff members, as well as collaborators from other agencies, universities, and industry, must have reliable access to these unique, large, and complex facilities. (*Id.*) It is UT-Battelle's business judgment that cutting-edge research is

2

best conducted when the scientists, engineers, and support personnel are on site – and safe and healthy – with reliable access to research facilities. (*Id.*). Having staff on site is critical to the discovery and innovation necessary to accomplish missions that strengthen U.S. national, economic, and energy security. (*Id.* ¶ 7). Staff members also need to be on site to keep facilities maintained and safely operating. (*Id.*). Among ORNL facilities is the High Flux Isotope Reactor, the nation's most powerful research reactor producing isotopes for cancer treatment, national security, and deep space missions; the Spallation Neutron Source, among the world's most intense pulsed neutron beams; and the Oak Ridge Leadership Computing Facility, which is home to the nation's most powerful supercomputer; currently building the first exascale computer in a race against China. (*Id.*).

## II.   UT-BATTELLLE'S RESPONSE TO COVID-19

As an initial response to COVID-19, to facilitate the reliable operations required to fulfill obligations to the DOE and other customers, UT-Battelle stood up a high-complexity medical laboratory to administer on-site COVID-19 testing of employees, initiated lab-wide COVID-19 safety controls such as face coverings and social distancing prescribed by the Centers for Disease Control and Prevention (CDC) and at the outset of the pandemic implemented large-scale work-from-home for nearly 75 percent of the ORNL workforce. (*Id.* ¶ 9). Despite these measures, ORNL still had a high incidence of COVID-19 infections, especially between the months of November of 2020 and January of 2021. (*Id.*) All told, the cost of these COVID-19 response actions was over $26 million, including approximately $12 million to operate its COVID-19 testing program. (Powell Aff. ¶ 8, attached as Ex. B).

Between February 2021 and June 2021, after vaccines became widely available and ORNL began administering the vaccine to staff, the incidence of COVID-19 at the Lab dramatically

dropped. (Zahn Aff. ¶ 10 ).

### III. UT-BATTELLE ANNOUNCES ITS VACCINE REQUIREMENT AND PROCESS FOR SEEKING RELIGIOUS OR ADA ACCOMMODATIONS

In April 2021, Lab leadership made the decision to steadily bring staff back to campus and re-acclimate them to working on site. (*Id.* ¶ 11). Lab Director Thomas Zacharia chartered a team headed by ORNL Deputy for Operations Alan Icenhour to create an orderly plan for the return of all staff to the Lab. (*Id.*). Returning all staff to the laboratory was a critical step in firmly reestablishing an organizational culture in all staff, including those hired during the pandemic who had not had the opportunity to come on site at all. (*Id.* ¶ 12).

Beginning in July of 2021, however, COVID-19 infections began to rise again in the community. (*Id.* ¶ 13). This surge negatively impacted ORNL's ability to return all staff to the Laboratory. (*Id.*). By approximately the third week of July, the four-county area of Anderson, Knox, Loudon, and Roane, where most staff members reside, became a "high transmission" area as defined under DOE criteria. This was the first time the area had reached that level of community transmission since March 2021. (*Id.*).

In response, ORNL implemented CDC's safety controls for vaccinated individuals in areas of high transmission, including face coverings while indoors except when alone in an office, as well as outdoors when individuals could not socially distance. (*Id.* ¶ 14). Unvaccinated individuals' safety requirements remained the same: maintain social distance and wear face coverings. (*Id.*). Despite these safety controls, and despite the fact that some employees had been vaccinated, the Lab began to see significant increases in COVID-19 infections beginning in late June 2021. (*Id.* ¶ 15).

The significant increase in risk to the health and safety of staff members, and the resulting risk to the reliability of ORNL research and operations, prompted ORNL to announce **on August**

4

**26, 2021**, that all staff would be required to be vaccinated by **October 15, 2021**, unless a staff member had: (1) a disability that prevented an employee from taking the vaccine, which would prompt an analysis on whether that individual would be reasonably accommodated, without creating an under hardship on UT-Battelle; or (2) a sincerely-held religious belief that precluded vaccination, which would prompt an analysis on whether that individual could be accommodated without creating an undue burden on UT-Battelle. (*Id.* ¶ 16). After announcing its vaccination requirements, UT-Battelle promptly developed an automated process for staff to request an accommodation for either medical or religious reasons. (*Id.* ¶ 17).

UT-Battelle requested personnel seeking exemptions to submit their requests by September 15, 2021, to ensure that those who were not granted an exemption would have adequate time to receive a vaccination. (*Id.* ¶ 18). This was a request, not a requirement for consideration. (*Id.*).

## IV.    UT-BATTELLE'S RESPONSE TO ACCOMMODATION REQUESTS

UT-Battelle received 75 requests for medical accommodations, and it received 145 requests for exemptions based on sincerely held religious beliefs (a number of employees asking for accommodations made multiple requests). (*Id.* ¶ 19). A team comprised of representatives from Human Resources, the Office of General Counsel and the Health Services Division evaluated each staff person's submittal outlining the nature of their medical issue or religious belief and the accommodation they would like. (*Id.*).

### A.  A Majority of ADA Accommodation Requests Are Granted.

Of the 75 requests for medical exemptions submitted, 47 were granted, 3 are pending, and 25 were denied. (*Id.* ¶ 20). One of the denials was Plaintiff Gregory Sheet's request because he refused to allow UT-Battelle to make further inquiry from his medical provider to better understand the basis for his request. (*Id.*). Further inquiry regarding Mr. Sheets' request was

necessary because the information he provided did not identify a contraindication for vaccination under CDC guidelines. As of this date, Mr. Sheets has still not provided adequate medical documentation to allow reconsideration of our denial of his request. (*Id.*). Plaintiff Mark Cofer's request, which was only submitted on October 7, 2021, is pending while the company awaits his execution a medical release. (*Id.*).

### B. UT-Battelle's Analysis of Religious Accommodation Requests

UT-Battelle had 145 employees submit requests for accommodations based on asserted religious beliefs. (*Id.* ¶ 21). UT-Battelle evaluated each submission and, in 24 cases, conducted in-person discussions with employees. (*Id.*). This staff engagement provided a better understanding of the basis for the religious exemption requests received and made clear that the bases for the accommodation requests were personal and subjective. (*Id.*). Also, during each of the two days of interviews, an employee on the interview list tested positive for COVID-19. (*Id.*). One employee completed their interaction with the panel before receiving their test results, potentially exposing panel members to the virus. (*Id.*). Because (1) the basis for each employee's request was personal and subjective, and (2) the personal interviews introduced a health and safety risk to the panel members, UT-Battelle elected at that time to discontinue the interview process and to focus evaluation on the personal statements that were submitted with the accommodation requests. (*Id.*). For the purposes of making accommodation decisions, UT-Battelle decided to not evaluate the sincerity of its employees' convictions at this juncture, to grant the exemptions, including the Plaintiffs', and went on to determine an appropriate accommodation that would not present an undue hardship on the Lab. (*Id.* ¶ 22). This approach is consistent with EEOC guidance instructing that an employer should ordinarily assume that an employee's request is based on a sincerely held religious belief absent an "objective basis" for questioning the religious nature or

6

sincerity of the particular belief. (*Id.* ¶ 22).

The first commonly requested accommodation was providing enhanced COVID-19 testing. (*Id.* ¶ 23). While ORNL has had an aggressive testing program throughout the pandemic, the cost has been substantial – approximately $12 million. (*Id.* ¶ 24). More importantly, the experience of late summer and early fall shows that testing does not adequately diminish the risk of onsite transmission. (*Id.*). Despite the Lab's robust COVID-19 safety protocols, cases rose steadily at the Lab as they did in the community. (*Id.*). The risk posed by unvaccinated staff members was exemplified by the employees who tested positive on the day they were being interviewed about their religious accommodation requests. (*Id.*). UT-Battelle concluded that accommodating individuals with enhanced on-site COVID-19 testing would cause more than a minimal burden on operations and would continue to compromise workplace safety, and, as such, presented an undue hardship. (*Id.* ¶ 25).

UT-Battelle also considered frequent testing but requiring employees to be tested offsite on their own time. (*Id.* ¶ 26). However, the local community has experienced delays in test results during periods of high transmission, and the rapid tests that are currently available are significantly less accurate than the polymerase chain reaction (PCR) testing capability utilized at ORNL. (*Id.*). Consequently, UT-Battelle determined that offsite testing was not a reasonable accommodation and that the problems associated with offsite testing created an undue hardship. (*Id.*). Furthermore, given the lag time between taking a PCR test and getting a result, frequent testing would still expose employees' to a risk of getting COVID at work. (*Id.*).

Another common request was to allow persons who can work from home to be given the opportunity to do so. (*Id.* ¶ 27). A long-term work-from-home accommodation runs counter to UT-Battelle's experience that on-site staffing is essential for efficiently, effectively, and safely

performing the collaborative work that is fundamental to the success of a research organization. (*Id.*). UT-Battelle determined that remote work as a long-term accommodation would cause an undue hardship because it eliminates an essential job function and presents more than a minimal burden on Lab operations and strategy. (*Id.*). During the early days of the pandemic, remote work was a necessary temporary response as the entire country was experiencing the same disruptions. (*Id.*). But throughout the pandemic, UT-Battelle realized that employees working from home was not as effective as in person work.

Some employees seeking an exemption have maintained that having been previously infected with COVID 19, they have a natural immune response and thus do not need a vaccination. (*Id.* ¶ 28). UT-Battelle carefully considered this position and determined it was unable to accommodate the request to exempt them from vaccination for having COVID antibodies. (*Id.*). Specifically, the Safer Federal Workforce Task Force in its September 24, 2021 "COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors" has stated that an employee may not submit an antibody test in lieu of evidence of vaccination. (*Id.*). This aligns with the CDC's guidance and its interim clinical considerations which provides that antibody testing is not recommended for vaccine decision-making or to assess immunity following vaccination. (*Id.*).

As UT-Battelle sought appropriate accommodations for staff from the vaccination requirement in keeping with EEOC guidelines, the company determined the most reasonable accommodation, namely for those with religious exemptions, was to allow those staff members to continue as employees but to go on leave for a period of ***60 days***. (*Id.* ¶ 29). During this time, the employees will be on unpaid leave and may use their remaining vacation until it is exhausted. (*Id.*). At the end of the 60 days, UT-Battelle will reassess the conditions to determine whether other

8

accommodations are appropriate. (*Id.*).  Those employees who are on leave during these 60 days will retain their company-provided health benefits. (*Id.* ¶ 30).  UT-Battelle will continue to pay its portion of their health insurance premiums for up to 60 days, depending on the date such leave begins. (*Id.*).  In addition, those employees will continue to accrue company service credit.  (*Id.*). If they have security clearances, those clearances will be maintained for 90 days. (*Id.*).

## V.  UT-BATTELLE'S OBLIGATIONS AS A FEDERAL CONTRACTOR

Due to the unique nature of its contractual relationship with DOE, UT-Battelle is often subject to different requirements from those of private industry. (Powell Aff. ¶ 18). At this time, DOE requirements flowed down to UT-Battelle through DOE's COVID-19 Workplace Safety Plan, which incorporates among other things the requirements established in the President's Executive Orders. (*Id.*). On September 9, 2021, President Biden issued Executive Order 14042. (*Id.* ¶ 19).  That Executive Order created the Safer Federal Workforce Task Force (the Task Force) and required that federal agencies include contract provisions requiring that contractors, like UT-Battelle, comply with all guidance issued by the Task Force. (*Id.*).  The Task Force issued guidance on September 24, 2021 and published the guidance at the following web address: https://www.saferfederalworkforce.gov/contractors/.  (*Id.* ¶ 20).  The guidance requires that federal contractors mandate the vaccination of contractor employees, except in limited circumstances where an employee is legally entitled to an accommodation. (*Id.* ¶ 21).

What is more, UT-Battelle's contract with DOE has been modified to include the following: "The Contractor shall comply with all guidance, including guidance conveyed through Frequently Asked Questions, as amended during the performance of this contract, for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force (Task Force Guidance) at https:/www.saferfederalworkforce.gov/contractors/."  If UT-Battelle wants to

maintain its contract to manage ORNL, it must continue to ensure that all staff are vaccinated, subject to reasonable accommodations that would not cause an undue hardship. (*Id.* ¶ 22). The loss of a contract with annual revenues of approximately $2.5 billion and an award fee of approximately $15 million would be more than *de minimis* and cause an undue hardship. (*Id.*). Without the contract to manage ORNL, UT-Battelle would cease to exist.

Having a contractual requirement to comply with government "Frequently Asked Questions" which are periodically updated and changed on a website is out of the ordinary. (*Id.* ¶ 23). Some of these new requirements are relevant to the issues surrounding vaccination and potential accommodations. For example, One of the Task Force Guidance's Frequently Asked question reads as follows: "Q: Are covered contractor employees who have a prior COVID-19 infection required to be vaccinated? A: Yes, covered contractor employees who have had a prior COVID-19 infection are required to be vaccinated." (*Id.*).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 governs the Court's power to grant injunctive relief, including temporary restraining orders. Fed. R. Civ. P. 65(b). "Temporary restraining orders and preliminary injunctions are ***extraordinary remedies*** which should be granted only if the movant carries his burden of proving that the circumstances clearly demand it." *Ciavone v. McKee*, No. 1:08-cv-771, 2009 U.S. Dist. LEXIS 138697, 2009 WL 2096281, at *1 (W.D. Mich. July 10, 2009) (emphasis added) (citing *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)). A preliminary injunction has been characterized as "one of the most ***drastic tools*** in the arsenal of judicial remedies." *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (emphasis added) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)). Further, where "a preliminary injunction is mandatory—that is, where its terms would

alter, rather than preserve, the status quo by commanding some positive action . . . the requested relief should be denied unless the facts and law clearly favor the moving party." *Glauser-Nagy v. Med. Mut. of Ohio*, 987 F. Supp. 1002, 1011 (N.D. Ohio 1997).

In determining whether to issue a temporary restraining order or preliminary injunction under Federal Rule of Civil Procedure 65, a district court considers the following four factors: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *See, e.g., Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007); *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006) (noting that the same four factors apply regardless of whether the injunctive relief sought is a TRO or a preliminary injunction). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009).

## ARGUMENT

## I.  PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS OF ANY OF THEIR CLAIMS

### A.  Plaintiffs' ADA Claims Are Not Likely to Succeed on the Merits

#### 1.  UT-Battelle Engaged in the Interactive Process As Envisioned by the ADA and *Granted* a Majority of the ADA Accommodation Requests Received

In response to each ADA accommodation request received, UT-Battelle engaged in an individualized interactive process to determine whether each employee could be reasonably accommodated without incurring an undue hardship. To date, ***nearly two-thirds of those requests have been granted***. Many of those requests that were denied were denied because the requestor failed provide UT-Battelle with the type of medical documentation employees seeking medical

11

accommodations typically provide.  Simply put, Plaintiffs face little chance of success on their ADA claims, let alone a likelihood.

The ADA contemplates employers providing "*reasonable* accommodations to the known physical or mental limitation of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an *undue hardship*." 42 U.S.C. § 12112(b)(5)(A) (emphasis added).  When an employee requests a reasonable accommodation based upon a disability, regulations interpreting the ADA encourage an employer to engage in an "interactive process" with the employee, to determine if an accommodation can be given that does not create an undue hardship on the employer. 29 C.F.R. § 1630.2(*o*)(3).  The Sixth Circuit has described the ADA's requirement of an interactive process as follows:

> 'The ADA's regulations indicate that, 'to determine the appropriate reasonable accommodation for a given employee, it may be necessary for the employer to initiate an informal, interactive process with the employee.'  The purpose of this process is to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'  Accordingly, 'the interactive process requires communication and good-faith exploration of possible accommodations.'

*Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (quoting 29 C.F.R. § 1630.2(*o*)(3); *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1114 (9th Cir. 2000)).[1]

Plaintiffs contend that UT-Battelle has violated the ADA on a systemic, class-wide basis. (*See* Compl. 101-109).  They aver that this employer failed to "comply with its obligations under

---

[1] The ADA does not require this process to be conducted perfectly or just as an employee desired.  In *Kleiber,* the Sixth Circuit found that the employer had not violated the Act by discharging an employee after a functional capacity examination was conducted and an interactive process ensued, even when the court noted that, "the interactive process that took place here appears not to have been a model interactive process." *Kleiber,* 485 F.3d at 871-72.

federal civil rights law to engage in the interactive process when responding to each accommodation request." (*Id.* at 106(b)). The facts utterly belie these allegations. Seventy-five employees have submitted requests for medical accommodations with respect to UT-Battelle's vaccine requirement. (*See* Zahn Decl. ¶ 20). UT-Battelle addressed each of these accommodation requests on a case-by-case, individualized basis. (*Id.* at ¶¶ 20-21). UT-Battelle considered, amongst other facts – whether the employee's request supported by medical documentation, what were the essential functions of that employee's job, and the nature of the accommodation requested. (*Id.*). UT-Battelle evaluated each of these requests, even if they were received after September 15, 2021 ... a date by which accommodation inquiries were *requested* so the company could have time to individually evaluate them, but not a date by which such inquiries were *required.* (*Id.* at ¶ 18).

Plaintiffs would have the Court believe that UT-Battelle took a cookie-cutter approach to ADA accommodation requests, but the numbers tell another story. Of the 75 accommodation requests received, 47 have been *granted*. (*Id.* at ¶ 20). These employees will not be going on leave as of October 16, 2021. Thus, a *majority* of the ADA requests received have been granted in a fashion to allow for the employees to continue to perform their job functions. Three ADA requests are currently pending, including the request of Named Plaintiff Mark Cofer. (*Id.*). Twenty-five have been denied. (*Id.*). The reasons for these denials vary, but many were denied when the employees refused to provide medical documentation to support their need for an accommodation. (*See id.*). The ADA specifically allows for "employers . . . to make inquiries … necessary to the reasonable accommodation process . . . ." *Kennedy v. Superior Printing Co.*, 215 F.3d 650, 656

(6th Cir. 2000) (quoting 29 C.F.R. pt. 1630, App. § 1630.14(c)).[2]  Furthermore, as set forth in EEOC's guidance on this subject, "If an individual's disability or need for reasonable accommodation is not obvious, and s/he refuses to provide the reasonable documentation requested by the employer, then s/he is not entitled to reasonable accommodation." EEOC Enforcement Guidance:  Reasonable Accommodation and Unique Hardship Under the Americans with Disabilities Act (2002), at ¶ 6.

### 2. The Claims of the Two Named Plaintiffs Raising ADA Claims Further Highlight How Plaintiffs Are Unlikely to Succeed.

Named Plaintiffs Mark Cofer and Gregory Sheets are pursuing both religious and medical accommodation claims. (Compl. ¶ 7, 8).  They are the only two Plaintiffs with ADA claims. (*See id.*).  Consideration of the facts surrounding their requests further demonstrate unlikeliness of success in the Complaint's ADA claims.

The ink is barely dry on Cofer's accommodation request.  He submitted that request on October 7, 2021, a mere five days before filing suit. (*See* Zahn Decl. ¶ 20).  As his own pleadings confirm, "that request remains pending." (Compl. ¶ 7).  That request remains pending because additional information is needed before an ADA accommodation determination can be made. Specifically, UT-Battelle is waiting on documentation from his healthcare provider attesting to a disability that requires an accommodation … an inquiry the ADA specifically permits prior to granting an accommodation. *Kennedy,* 215 F.3d at 656; 29 C.F.R. pt. 1630, App. § 1630.14(c). But Sheets has refused to provide UT-Battelle with medical documentation to support his ADA accommodation request. (*See* Zahn Decl. ¶ 20.  His stated reason for not providing this documentation was that, "I am a little paranoid at this point and really don't want them to deny me

---

[2] *Erbel v. Johanns*, No. 304-CV-555, 2007 WL 1387331, at *7 (E.D. Tenn. May 8, 2007)  ("The employer is "entitled to require that the employee provide medical documentation sufficient to prove that he or she had a condition requiring accommodation.")

on a technicality." (Sheets Sept. 23, 2021, Email Chain, attached as Ex. C).  Failure or refusal to provide medical documentation in support of an accommodation request is a legally valid reason to deny that request, *not* a reason to grant the extraordinary remedy of injunction.

**B. Plaintiffs' Title VII Claims Are Not Likely to Succeed Because All of the Accommodations Proposed by the Plaintiffs Would Cause More than a *De Minimis* Burden on UT-Battelle and its Mission with the Department of Energy**

A proposed accommodation causes an undue hardship under Title VII when it presents more than a "de minimis" cost or burden on the employer.  This is a low standard for an employer to meet and, thus, a high hurdle for a plaintiff to overcome in a religious accommodation lawsuit. All of the accommodations proposed by Plaintiffs would present more than a *de minimis* hardship, and they are unlikely to succeed on the merits of their Title VII claims.

The concept of a *de minimis* cost in the Title VII context was established more than forty years ago. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977) ("To require TWA to bear more than a de minimis cost in order to give Hardison Saturdays off is an undue hardship."). The Sixth Circuit has echoed this holding, noting that "[t]o require an employer to bear more than a de minimis cost in order to accommodate . . . is an undue hardship." *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994) (citing *TWA, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)) (emphasis added).  This bar is low for an employer.  "De minimis" means a "***very small or trifling matter***[.]" *See Small v. Memphis Light, Gas & Water*, 952 F.3d 821, 828 (6th Cir. 2020) (Thapar, J., concurring) (citing Black's Law Dictionary 388).  A proposed accommodation need not impose economic costs on an employer to constitute "hardship."

If a proposed accommodation could cause an "adverse impact" on other employees, that is sufficient to establish hardship. *Virts v. Consol. Freightways Corp. of Del.*, 285 F.3d 508, 520 (6th Cir. 2002) (citations omitted); *see also Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1380 (6th Cir.

1994); *Lee v. ABF Freight Sys., Inc.,* 22 F.3d 1019, 1023 (10th Cir. 1994) (accommodation that places an imposition on other employees more than a *de minimis* burden). Further, "[a] religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship. . . ." *EEOC v. GEO Grp., Inc,* 616 F.3d 265 273 (3d Cir. 2010). Nor does the law does not require an employer, or its employees, to wait for those adverse impacts to materialize before deeming it a hardship; the "mere possibility" that it may do so is sufficient. *Virts,* 285 F. F.3d at 520 (citing *Weber v. Roadway Express, Inc.,* 199 Fed. 270 (5th Cir. 2000)).

Perhaps Plaintiffs seek to leapfrog the orderly EEOC process for good reason—the EEOC acknowledges the low burden of establishing an undue hardship, noting that it must consider:

> Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business. For example, courts have found undue hardship where the accommodation diminishes efficiency in other jobs, infringes on other employees' job rights or benefits, impairs workplace safety, or causes coworkers to carry the accommodated employee's share of potentially hazardous or burdensome work. Whether the proposed accommodation conflicts with another law will also be considered.

*EEOC Compliance Manual on Religious Discrimination,* 1/15/2021, https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination (last accessed 10/14/2021).

Each of the accommodations proposed by Plaintiffs would present more than a *de minimis* cost or hardship to UT-Battelle, and would thus constitute an undue hardship:

**On-Site Covid Testing:** Plaintiffs opine that "unlike *Hardison,* UT-Battelle did not attempt to determine the costs of accommodating its employees." (Pl.'s Br. at 14). Not true. UT-Battelle knows very well the cost of providing employees with on-site COVID testing. Since the outset of the pandemic, it has paid for over 65,000 COVID tests and related costs at an expense of more than $12 million. (Powell Aff. ¶ 8). While UT-Battelle – like everyone else – had hoped that

16

COVID would be temporary, 18 months into the pandemic, it is still here. Continuing to pay significant sums for COVID testing for the foreseeable future is not maintainable. It would certainly more than a *de minimis* cost within the meaning of Title VII.

**Off-Site Covid Testing:** To the extent Plaintiffs suggest that UT-Battelle should allow periodic off-site testing as an accommodation, this proposed accommodation likewise presents more than a *de minimis* hardship to UT-Battelle and its workforce. Results from PCR tests can take days. An employee could test on a Monday, work until Wednesday, only to find out that he or she had tested positive two days earlier and exposed many coworkers to COVID. While rapid tests are quicker, it is well-documented that they are less accurate than PCR tests. While even vaccination (plus mask wearing) cannot completely eliminate the possibility of transmission, the likelihood of transmission is inarguably higher when an employee is unvaccinated,[3] and the "mere possibility" that another employee would bear the adverse impact of infection constitutes an undue hardship.

**Periodic Testing for COVID-19 Antibodies:** Plaintiffs propose "periodic testing for COVID-19 antibodies. (Pl.'s Br. at 15). But again, testing costs money. There is no reason to believe that providing on-site testing for antibodies would not impose a significant financial cost, as did on-site testing for COVID. Moreover, there is little scientific evidence to suggest that the presence of antibodies from previously getting COVID provides anywhere near the protection that vaccines do.[4] This proposed approach would cause a more than *de minimis* financial burden on

---

[3] *See, e.g., No, Vaccinated People Are Not 'Just as Likely' to Spread the Coronavirus as Unvaccinated People,* The Atlantic, https://www.theatlantic.com/ideas/archive/2021/09/the-vaccinated-arent-just-as-likely-to-spread-covid/620161/ (last accessed 10/14/2021); *COVID* Vaccines Cut the Risk of Transmitting Delta, *Nature,* 10/5/2021, https://www.nature.com/articles/d41586-021-02689-y#ref-CR1 (last accessed 10/14/2021).

[4] *See* New CDC Study: Vaccination Offers Higher Protection than Previous COVID-19 Infection (Aug. 6, 2021), https://www.cdc.gov/media/releases/2021/s0806-vaccination-protection.html, last accessed 10/14/2021.

UT-Battelle and present more than a *de minimis* risk of employees spreading the virus at the worksite. What is more, UT-Battelle now has a contractual obligation to comply with Task Force FAQs, one of which says that antibody testing is insufficient to comply with those FAQs. (*See* Powell Aff. ¶ 23).

*Mask Wearing:* Plaintiffs suggest that "mask wearing" would be a possible accommodation. (Pl.'s Br. at 15). This is a red herring. ***All employees*** at UT-Battelle must currently wear masks, irrespective of vaccination status. As of October 15, 2021, UT-Battelle is requiring *both* vaccination *and* mask wearing, a position consistent with CDC guidance, which strongly suggest that in enclosed spaces during the Delta variant, both vaccination and mask wearing is necessary to minimize the risk of spreading COVID.[5] Hence, rather than an accommodation alternative, Plaintiffs' suggestion of masking as an accommodation is nothing more than a request to be relieved of the vaccination requirement.

At the end of the day, Plaintiffs claim that UT-Battelle failed to engage in an appropriate process under Title VII because they do not like the accommodation that was ultimately offered—unpaid leave for sixty days, with continued benefits eligibility. Title VII does not dictate that an employee gets the accommodation he or she prefers, and *all* of the accommodations proposed by Plaintiffs would cause an undue hardship. Consequently, and at absolute minimum, Plaintiffs cannot show a likelihood of success.

### C. Plaintiffs' Class Claims Are Unlikely to Succeed Because Individualized Issues Will Predominate

"The class action is 'an exception to the usual rule that litigation is conducted by and on

---

[5] Delta Variant: What We Know About the Science (Updated Aug. 26, 2021), https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html?s_cid=11504:delta%20variant%20protection%20vaccine:sem.ga:p:RG:GM:gen:PTN:FY21

behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700–701 (1979)). For a class to be maintainable under Rule 23(b)(3), a court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members …" FED. R. CIV. P. 23(b)(3). One of the factors a court must consider in this analysis is "the likely difficulties in managing a class action." *Id.*

Individualized issues will predominate in this matter, making a class action wholly inefficient and unmaintainable. With respect to the Complaint's religious accommodation claims, a threshold question for *every* Named Plaintiff and *every* class member will be whether the objection to vaccination is based upon a sincerely-held religious belief. In order to establish a prima facie case of religious discrimination under Title VII, "a plaintiff must show that (1) he holds *a sincere religious* belief that conflicts with an employment requirement; (2) he has informed the employer about the conflicts; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement." *Jiglov v. Hotel Peabody, G.P.*, 719 F. Supp. 2d 918, 927 (W.D. Tenn. 2010) (emphasis added). "To ascertain whether an activity qualifies as the kind of religious belief that merits accommodation, courts look to whether the beliefs professed by a claimant are sincerely held and whether they are, "in his own scheme of things," religious." *EEOC v. Publix Super Markets, Inc.,* 481 F.Supp.2d 684, 699 (M.D. Tenn. 2020) (citation omitted). "Title VII does not protect employees seeking to obligate an employer to accommodate purely secular preferences." *Id.* (citing *Duran v. Select Med. Corp.*, No. 08-cv-2328-JPM-tmp, 2010 WL 11493117, at \*5 (W.D. Tenn. Mar. 19, 2010)).

The gateway question of a sincerely-held belief is an inherently individualized, fact-based inquiry. Deposition testimony will be needed from every plaintiff and every class member to

determine whether they are entitled to any relief under Title VII. Interest of efficiency and maintainable will not be served in certifying the class Plaintiffs propose.

With respect to the 25 employees who have been denied a medical accommodation, their claims will also require numerous individualized inquiries. As set forth above, the reasons for those denials varied. Testimony will be needed from each to determine whether they provided medical documentation to support their ADA accommodation request, and whether that documentation actually supported the need for an accommodation.

### D. Plaintiffs' Complaint Fails to State a Claim Because They Have Failed to Exhaust Their Administrative Remedies

Plaintiffs' claims are procedurally barred because they have failed to exhaust their administrative remedies with the EEOC. "It is well settled that a plaintiff must satisfy two prerequisites before filing a Title VII action in federal court: (1) timely file a charge of employment discrimination with the EEOC; and (2) *receive and act upon the EEOC's statutory notice of the right to sue ("right-to-sue letter")*." *Granderson v. Univ. of Michigan*, 211 F. App'x 398, 400 (6th Cir. 2006) (emphasis added) (citing *Puckett v. Tennessee Eastman Co.,* 889 F.2d 1481, 1486 (6th Cir. 1989)). "The proper exhaustion of administrative remedies gives the Title VII plaintiff a green light to bring an employment-discrimination claim in court." *Id.*

The Plaintiffs admittedly did not wait for this green light. Instead, they rely completely on out-of-circuit precedent for their assertion that this Court "may exercise its equity jurisdiction to grant preliminary injunctive relief." *See* Compl. ¶ 118 (citing *Drew v. Liberty Mutual Insurance Co.*, 480 F.2d 69 (5th Cir. 1973)). The propriety of asserting jurisdiction prior to the exhaustion of EEOC remedies for the limited purpose of granting temporary injunctive relief is a question that has divided the authorities. The court in *Drew,* 480 F.2d 69, indicated that in limited instances where irreparable harm and a likelihood of ultimate success on the merits are adequately

demonstrated, an aggrieved employee may properly initiate suit "to maintain the status quo pending the action of the Commission on the basic charge of discrimination." *Id.* at 72.

This view has not been uniformly embraced. Numerous federal authorities have questioned the rationale of *Drew*, finding the exercise of jurisdiction absent compliance with the established jurisdictional prerequisites contrary to the congressional scheme mandating initial administrative efforts at conciliation and voluntary settlement. *See Troy v. Shell Oil Co.*, 378 F. Supp. 1042 (E.D. Mich.1974), appeal dismissed as moot, 519 F.2d 403 (6th Cir. 1975); *Nottelson v. A. O. Smith Corp.*, 397 F. Supp. 928 (E.D.Wis.1975); *Collins v. Southwestern Bell Telephone Co.*, 376 F. Supp. 979 (E.D. Okl. 1974); *Gradillas v. Hughes Aircraft Co.*, 407 F. Supp. 865 (D. Ariz. 1975). The First and Seventh Circuits, while reserving determination on the question, have similarly observed that the assertion of federal jurisdiction pursuant to the rationale of *Drew* may not comport with the congressional intent underlying the enactment of Title VII. *Hochstadt v. Worcester Foundation For Experimental Biology*, 545 F.2d 222, 226 (1st Cir. 1976); *Berg v. LaCrosse Cooler Co.*, 548 F.2d 211, 212 (7th Cir. 1977).

The Sixth Circuit's decision in *Jerome v. Viviano Food Company, Inc.*, 489 F.2d 965 (6th Cir. 1974) casts serious doubts on the viability of *Drew*. In *Jerome*, the court found that appellant had not satisfied the prerequisites to instituting suit under Title VII and affirmed the district court's decision denying a temporary injunction and dismissing the complaint. While *Jerome* did not explicitly reject the *Drew* rationale, the court in dicta appeared to express its disapproval of it, admonishing the appellant for "seeking by case law decision to obviate the statutorily required cooling off and conciliation period set forth in the Equal Employment Opportunity Act." *Jerome*, supra at 966. *See also Doerr v. B. F. Goodrich Co.*, 484 F. Supp. 320 (N.D. OH 1979) (finding that the court lacked jurisdiction to issue the requested preliminary relief based on the weight of

21

the authority in the Sixth Circuit and this interpretation of *Jerome*).

*Jerome* has been interpreted by at least one circuit court as precluding the issuance of preliminary relief "until the procedures set down in Title VII have been followed." *Berg v. LaCrosse Cooler Co.*, supra at 212 n. 1. The district court in *Troy v. Shell Oil Co.*, supra, has construed *Jerome* in a similar fashion, explaining:

> It was this obvious extension of Title VII by judicial action that apparently prompted the Sixth Circuit Court of Appeals, in *Jerome v. Viviano Food Co.*, 489 F.2d 965, 966 (6th Cir. 1974), to criticize the appellant there, who was "seeking by case law decision (i.e. Drew, upon which the appellant relied heavily) to obviate the statutorily required cooling off and conciliation period set forth in the Equal Employment Opportunity Act". After citing *Love v. Pullman Co.*, 404 U.S. 522 and *Goodman v. City Products Corp.*, 425 F.2d 702 (6th Cir.), supra, for the proposition that exhaustion of administrative remedies is a precondition to suit under Title VII, the court was content to distinguish Drew on the facts, holding that Jerome had not demonstrated irreparable harm and therefore an injunction was not available, even if the court had jurisdiction to issue one (an issue on which the court expressed no clear opinion). Nonetheless, the court's wariness of the judicial activism demonstrated by the Drew court is clear and, in my opinion, convincing on the issue of how far its lead will be followed in this circuit.

*Troy v. Shell Oil Co.*, supra at 1047.

It is well-settled that a plaintiff cannot file a Title VII or ADA lawsuit until exhausting his or her remedies with the EEOC. The one Sixth Circuit case to address *Drew* declined to follow it.

## II.     PLAINTIFFS' ALLEGED DAMAGES ARE SUBJECT TO MATHEMATICAL CALCULATION, AND THUS THEY CANNOT SHOW IRREPARABLE INJURY

The Supreme Court "has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citations omitted). Irreparable harm is an "indispensable" requirement for a preliminary injunction, and in the absence of irreparable harm,

22

injunctive relief cannot be granted. *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326 (6th Cir. 2019). To show irreparable harm sufficient to justify entry of preliminary injunctive relief, a moving party must prove that such injury is both "likely" and "imminent." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (quoting *D.T.*, 942 F.3d at 327) (the plaintiffs needed to show "certain and immediate" harm, not "speculative or theoretical" harm that would result in the absence of granting injunctive relief); *Contech Casting, LLC v. ZF Steering Sys., LLC,* 931 F. Supp. 2d 809, 818 (E.D. Mich. 2013) (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir.1991)) ("[T]he moving party must show that irreparable harm is 'both certain and immediate, rather than speculative or theoretical.'"). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

"The law is settled that a party moving for a preliminary injunction must establish more than mere monetary injury." *Contech Casting*, 931 F. Supp. 2d at 817 (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)) ("[I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury."); *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) ("[I]njuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.")). "In addition, and of critical importance, 'the irreparable harm requirement contemplates the inadequacy of alternate remedies available to the plaintiff.'" *Id.* at 818 (quoting *Smith & Nephew,*

*Inc. v. Synthes (U.S.A.)*, 466 F. Supp. 2d 978, 982 (W.D. Tenn. 2006)). "Thus, '[i]rreparable harm will not be found where alternatives already available to the plaintiff make an injunction unnecessary.'" *Id.* (quoting *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1248 (N.D. Iowa 1995)).

Plaintiffs allege they will be irreparably harmed by the offered accommodation of unpaid leave for 60 days because they will "suffer immediate financial hardship if they lose their regular income stream." (Pl. Br. at 5.) They allege that this loss of earnings will, in turn, affect their ability to afford health care, housing, education, and the like, and will cause "significant stress." (*Id.*) This alleged harm is insufficient for several reasons.

First, ***courts have consistently held that a party cannot show irreparable harm based on lost earnings***. *See, e.g., Sampson*, 415 U.S. at 90-92 (loss of earnings does not constitute irreparable harm); *Doe v. Ronan*, No. 1:09CV243, 2009 WL 10679456, at *2 (S.D. Ohio Apr. 20, 2009) (citing *Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566, 580 (6th Cir. 2002)) ("It is well-settled law that the loss of employment is not irreparable harm. . . . Loss of income, loss of insurance benefits and even the need to draw early from one's pension are damages that can be calculated and may be recovered by monetary damages."). Such losses are not "irreparable" because if Plaintiffs were to prevail on the merits, they would be entitled to reinstatement, back pay, and reimbursement of other proven economic damages. *See Addison v. City of Detroit-Dep't of Human Servs.*, No. 12-12793, 2012 WL 2524375, at *2 (E.D. Mich. June 29, 2012) ("Based on the Sixth Circuit's ruling that loss of income does not result in irreparable harm, [the plaintiff] is unable to meet the irreparable harm factor in order for the Court to issue a temporary restraining order. The irreparable harm factor weighs in [the defendant's] favor."); *Doe*, 2009 WL 10679456, at *2. The same is true here. *See Beckerich v. St. Elizabeth Med. Ctr.*, No. 21-cv 105, 2021 WL

24

4398027, at *6 (E.D. Ky. Sept. 24, 2021), *reconsideration denied*, 2021 WL 4722915 (E.D. Ky. Sept. 30, 2021). In *Beckerich,* healthcare workers moved for a temporary restraining order to enjoin medical center's mandatory COVID-19 vaccination policy, but the court recognized that "wrongful termination claims exist for that very reason—whether brought under the ADA, Title VII, or some other state or federal law, a wrongfully terminated plaintiff can receive monetary damages to compensate their loss of employment". *Id.* Because Plaintiffs can be compensated by monetary damages if they prevail, they cannot show irreparable harm.

Second, Plaintiffs' asserted harm is not "certain" or "actual," but rather is "theoretical." *Winter*, 555 U.S. at 22. All of the alleged secondary harms – loss of housing and ability to pay for education and so on – presuppose an extended period of time out of work on unpaid leave. But there is no basis for assuming that will occur because:

- UT-Battelle's policy is predicated on the current surge in COVID-19 cases in the community. (Zahn Decl. ¶¶ 13-17). If the surge subsides, this policy will be reassessed.

- UT-Battelle's current policy of providing unpaid leave to unvaccinated employees as an initial accommodation is neither universal nor permanent. UT-Battelle will re-evaluate the conditions in sixty days to determine whether other accommodations are appropriate. (*Id.* ¶ 29)

- There are a variety of other reasons why it would be imprudent to assume that the period of unpaid leave will last for "years," as Plaintiffs assert. (Pl. Br. at 13.) Right now, the leave is for sixty days.

- A clause to this effect has been added to UT-Battelle's prime contract, including a requirement to follow all Safer Federal Workforce Task Force guidance and associated Frequently Asked Questions. UT-Battelle is evaluated annually by DOE on its adherence to contract requirements and associated DOE direction. (*See* Powell Aff.).

- To the extent that Plaintiffs claim the harm they will suffer is being forced to forego their religious beliefs (Pl. Br. at 19), that is also insufficient. No one has been forced to surrender his or her legitimate beliefs – all had the option of taking the offered accommodation. In this regard, the case at hand is entirely distinguishable from the case Plaintiffs cite, *A. v. Hochol*, No. 21-cv-1009, 2021 WL 4189533

25

(N.D.N.Y. Sept. 14, 2021). (Pl. Br. at 19.) The state mandate in that case was enjoined because it lacked any religious accommodation at all, not because the accommodation offered was supposedly inadequate.

Third, none of the asserted harms are sufficiently "imminent" to justify emergency temporary injunctive relief.[6] To the extent Plaintiffs base their claim of irreparable harm on a theoretical inability to pay for medical care, such a claim is specious, at best. UT-Battelle has made clear that employees who are on leave **will retain their company-provided health benefits**, with UT-Battelle continuing to pay its portion of the employees' health insurance premiums for up to 60 days, depending on the date such leave begins. (Zahn Decl. ¶ 30) As to the other various harms Plaintiffs speculate they will suffer at some point in the future, such as a potential "need to consider other education options" (Pl. Br. at 20), these are, at most, potential harms that could occur at some point in the future, not certain harms that are about to occur in the next few days. There is more than adequate time to consider the issues in this case on a less expedited timeline.

That is especially so given that the supposed urgency here is largely a product of Plaintiffs' own waiting until the eleventh hour to seek relief. The law is well-established that "undue delay in seeking an injunction remedy 'is an important factor bearing on the need for a preliminary injunction.'" *Electromotive Div. of Gen. Motors Corp. v. Transportation Sys. Div. of Gen. Elec. Co.*, 275 F. Supp. 2d 850 (E.D. Mich. 2003) (quoting *High Tech Med. Instrumentation v. New Image Ind.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995)). "[A] delay in the request for an injunction weighs against a finding of irreparable harm." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, No. 4:06CV114, 2010 WL 3370286, at *2 (N.D. Ohio Aug. 26, 2010), *aff'd*,

---

[6] Courts routinely reject applications for temporary restraining orders when the harm is not truly immediate. *See, e.g., Abney v. Amgen, Inc.*, 443 F.3d 540, 551 (6th Cir. 2006) (Plaintiffs must establish they "will suffer immediate and irreparable harm absent injunctive relief."); *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982) (recognizing that successful motions for preliminary injunctions necessarily include a showing of immediate irreparable harm).

26

511 F. App'x 398 (6th Cir. 2013) (citations omitted). In this case, Plaintiffs acknowledge they were aware of UT-Battelle's policy as early as August 26, 2021. (Pl. Mem. at 3.) But they waited almost seven weeks, until just two days before the policy deadline, to file their motion.

As the court in *Bridges* held in a COVID context, anyone who loses wages for refusing a vaccine can sue for money damages. *Bridges v. Houston Methodist Hosp.*, 4:21-cv-01744, ECF No. 10 at 1 (S.D. Tex. June 4, 2021) (attached as Ex. D). Plaintiffs cannot show irreparable injury.

## III. HARDSHIP TO UT-BATTELLE OUTWEIGHS ANY POTENTIAL INJURY TO PLAINTIFFS

A TRO or preliminary injunction is an extraordinary remedy never awarded as a matter of right. *Munaf v. Geren,* 553 U.S. 674, 689-690 (2008). A court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambel, Alaska,* 480 U.S. 531, 542 (1987).

Balancing the harms weighs heavily against a TRO. When addressing this element, Plaintiffs claim that they will be forced to "forsake their religious belief and health." (Pl.'s Br. at 21). This simply is not so. No one will be required on October 15, 2021, to forsake their religion. Instead, those employees whose religious beliefs preclude vaccination will be given the accommodation of leave. Health benefit eligibility will be maintained during this period. With respect to allegedly being forced to forsake one's health, again, a majority of the ADA accommodation requests received have been granted. Any harm to the Plaintiffs' is relatively minimal, and if that harm is actionable, it can be remedied via Title VII and the ADA's statutory scheme on damages.

Conversely, the harm to UT-Battelle of an injunction would be immense. These harms include:

- Placing UT-Battelle employees at heightened risk of a highly transmissible COVID

variant that can cause long-term sickness and death.

- Causing an outbreak which negatively impacts UT-Battelle's ability to execute the important national missions of the Department of Energy.

- Potentially pushing UT-Battelle out of compliance of its contract with the DOE, thus placing that contract at risk.

This factor strongly militates against the extraordinary act of an injunction

## IV. THE PUBLIC INTEREST DOES NOT SUPPORT THE EXTRAORDINARY REMEDY OF A TRO

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger,* 456 U.S. at 312. The Supreme Court has observed that "'the award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff, and that 'where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.'" *Yakus v. United States,* 321 U.S. 414, 440 (1944).

Plaintiffs opine that granting the injunction "will serve the public interest" because "allowing employees to exercise religious freedom by making decisions in accordance with their religious beliefs is a public interest of the highest order." (Pl.'s Br. at 22). But the courts have faced similar arguments in past contexts and rejected those arguments. Consider *Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015). There, the plaintiffs argued that a state regulation permitting school officials to temporarily exclude students who are exempted from a vaccination requirement during an outbreak of a vaccine-preventable disease was an unconstitutional burden on those students' religion. In response to this claim, the Second Circuit observed: [T]he Supreme

Court has stated in persuasive dictum . . . that a parent "cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. ***The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death.***" *Id.* (emphasis added) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944)).

COVID-19 is the worst pandemic our country has faced since 1918. As of this filing, more than 700,000 Americans have died from this disease—more than died in the Spanish flu pandemic.[7] The extreme transmissibility of the Delta variant is well-documented. UT-Battelle respects those with sincerely-held religious beliefs that lead them to conclude they should not get vaccinated against this disease. But one's right to practice religion freely does not include the liberty to expose their coworkers to "ill health or death." *Id.* Nor does it include the freedom to impact UT-Battelle's ability to execute its contractual obligations to the Department of Energy. Considering these interests, the Court should follow those courts that have rejected similar motions. *See Klaassen v. Trs. of Ind. Univ.,* No. 1:21-CV-00238, ECF No. 34 (N.D. Ill. July 18, 2021) (attached as Ex. E), *aff'd* 2021 WL 3281209 *(pet. for review denied); Norris v. Stanley,* No. 1:32-CV-00756, ECF No. 7 (W.D. Mich. Aug. 31, 2021) (denying employee's request to enjoin employer's vaccine requirement for all Michigan State University employees) (attached as Ex. F); *see also Bridges,* 4:21-CV-01774, ECF No. 10 (order denying TRO and dismissing 117 employees lawsuit against its employer over the employees' termination for failing to comply with employer's vaccine requirement). To the extent that courts that made any finding on this point, they have concluded that

---

[7] *COVID-19 overtakes 1918 Spanish flue as the deadliest disease in American History,* Stat, 9/20/2021, https://www.statnews.com/2021/09/20/covid-19-set-to-overtake-1918-spanish-flu-as-deadliest-disease-in-american-history/ (last accessed 10/14/2021).

public health weighs heavily against an injunction. *See Bridges,* 4:21-cv-01774, ECF No. 10 at 2.

## CONCLUSION

All four factors at consideration for a TRO strongly weigh against the extraordinary remedy of a TRO.  Plaintiffs' motion for a TRO should be denied.

Dated this the 14th day of October 2021.

Respectfully submitted,

*/s/ Jonathan O. Harris*
Jonathan O. Harris, TN #021508
Keith D. Frazier, TN #012413
Darius Walker, Jr., TN #035408
 Luci L. Nelson, TN #36354
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
SunTrust Plaza
401 Commerce Street, Suite 1200
Nashville, TN  37219-2446
Telephone:  615-254-1900

Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on this the 14th day of October 2021 the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Melissa B. Carrasco
Egerton, McAfee, Armistead & Davis, P.C.
900 S. Gay Street, Suite 1400
Knoxville, TN 37902

Mark R. Paoletta
Gene C. Schaerr
Brian J. Field
Nicholas P. Miller
Annika M. Boone
SCHAERR I JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006

*/s/ Jonathan O. Harris*

30